IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JESUS V. & JOSE L.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JESUS V. AND JOSE L., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

EVELIN L., APPELLANT, AND SALVADOR V., APPELLEE.


Filed November 22, 2022.    No. A-22-351.


Appeal from the Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

David P. Thompson, of Thompson Law, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Haley N. Messerschmidt, for appellee.


PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Evelin L. appeals the order of the separate juvenile court of Lancaster County which terminated her parental rights to her two children, Jesus V. and Jose L. and overruled Evelin's motion for a change in visitation. Upon our de novo review of the record, we find sufficient statutory grounds for termination and that termination is in the best interests of the children. We affirm the juvenile court's order.

## BACKGROUND

Evelin is the biological mother of Jesus, born in 2017, and Jose, born in 2019. Between February 24 and April 11, 2022, hearings were held on the State's motion to terminate the parental rights of Evelin and Salvador V., the children's biological father. The juvenile court terminated the parental rights of both parents. Salvador has not appealed from the juvenile court's order. As

a result, for the purposes of this appeal, we concern ourselves only with the issues relevant to the termination of Evelin's parental rights.

The Nebraska Department of Health and Human Services (DHHS) became involved with Evelin shortly after the birth of her youngest son, Jose, in 2019. Jose was born premature and was diagnosed with Down syndrome. He also struggled to breathe on his own. Jose's doctors reported that the family had missed several appointments, that Jose was admitted to the hospital, and that there was concern regarding Evelin's mental health. Upon an investigation by DHHS, it was learned that Evelin had been hearing voices and acting erratically. Evelin was not engaging in the care of Jose and denied he had health problems. DHHS learned that Jesus, who was 2 years old at the time, also resided with Evelin in the home. An ex parte order for emergency temporary custody was entered November 4, 2019, removing Jesus and Jose from Evelin's home and placing them in foster care.

On November 5, 2019, the State filed a petition alleging that Jesus and Jose were juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition alleged that the juveniles were placed at risk of harm because Evelin had mental health issues that she was not addressing which resulted in her being unable or unwilling to provide adequate care and supervision for Jesus and Jose. Evidence was presented at a formal adjudication hearing held on February 10, 2020, at which time the juvenile court found the allegations to be true. An order of disposition was entered on March 12 which continued the children in foster care, adopted the case plan submitted by DHHS and found that the permanency goal order was reunification of the family.

On December 15, 2021, the State filed a motion to terminate Evelin's parental rights alleging that (A) Evelin had continuously neglected or refused to provide necessary parental care and protection to the children; (B) that reasonable efforts to reunify the family since the § 43-247(3)(a) determination failed to correct the conditions leading to that determination; and (C) that the children had been in an out-of-home placement for at least 15 of the most recent 22 months. A hearing was held on the State's motion over the course of 5 days on February 24, March 1, March 2, April 8, and April 11, 2022. At that hearing, the State called a DHHS caseworker who had worked with Evelin, the caseworker's supervisor, and a mental health therapist that had provided child-parent therapy for Evelin and the children. Evelin testified personally. She also called her most recent family support worker and a psychologist who had provided her individual therapy.

The plan of rehabilitation adopted by the court included that Evelin (1) participate in medication management services; (2) cooperate with a parenting and psychological assessment, as recommended by the initial diagnostic interview; (3) maintain a safe and stable home; (4) maintain a legal means of income; (5) cooperate with family support services; and (6) participate in supervised visitation.

DHHS was charged with assisting Evelin in obtaining necessary services in order to comply with the rehabilitative plan. While Evelin can speak and understand some English, her primary language is Spanish. Therefore, it was necessary that the services provided to her be offered in Spanish. Many of the individuals that worked with Evelin were bilingual but at times interpreters were necessary to facilitate communication. Evelin's participation with services varied from full engagement to complete withdrawal during the lifespan of the case. The beginning stages moved slowly due in part to the COVID-19 pandemic. Because of Jose's fragile medical condition,

in person visitation was suspended during the early stages of the plan. However, as time passed and the pandemic abated, Evelin demonstrated progress toward her goals. This progress was followed by a steep decline in May 2021 and then a complete withdrawal from services and visitation for a period of several months. However, in the months leading up to the termination of parental rights hearing, Evelin had re-engaged with services and therapy.

After her parenting and psychological assessment in May 2020, Evelin was ordered to participate in child-parent psychotherapy with the children. This therapy was provided by Holly Burns, a bilingual licensed independent mental health practitioner. Burns first became involved with the family in August or September 2020 but could not provide in-person therapy prior to February 2021 due to concerns about Jose's compromised immune system and his vulnerability to COVID-19. Burns testified that ideally in-person therapy would begin within 6 months of the family trauma, but that the delay was not harmful. Child-parent therapy did take place virtually prior to February 2021. Once in-person sessions began, they occurred during Evelin's visitation time. Because of the delays caused by the COVID-19 pandemic, in February 2021, DHHS authored a report asking the court to find that Evelin had not had a reasonable opportunity to avail herself of the necessary services. The court agreed and granted an exception. This allowed Evelin more time to fully engage with the services available from DHHS.

Once it was deemed safe to have in-person visitations, Evelin showed progress, moving from supervised to monitored visitation with some overnight visits allowed. Burns testified that during the child-parent psychotherapy sessions Evelin would have good days and bad days depending on the amount of sleep she had the night before. On bad days, Evelin would not participate or engage with the children. On good days, Evelin fully participated. In May 2021, Evelin's progress steeply declined.

Burns testified to an incident that occurred during a child-parent psychotherapy session on May 27, 2021. On that day, Burns arrived at Evelin's home for their usual session. She knocked on the door for a significant period of time before Jesus answered. She described Jesus as being scared. He took Burns' hand and led her into the home where he showed her a hole in the kitchen wall which according to Jesus, was caused by Evelin kicking it. Burns described Jesus as being terrified while he told her about the incident and Evelin's anger. Burns then came into contact with Evelin who appeared agitated and was exhibiting delusional thinking. Burns contacted DHHS to have the children removed safely. The police were also notified.

This was not the first time that the safety of the children was questioned during Evelin's visits. During another visit, a machete was found in one of the boys' closets. Additionally, an unknown and unauthorized gentleman was at the home during another visit. Burns also testified that Evelin at times became aggressive during other sessions. Stephanie Vensky, who supervised the caseworkers providing services to Evelin, also testified to multiple instances of Evelin acting aggressively toward providers.

In response to these safety concerns, visits between Evelin and the children were moved outside of the home to a visitation center. By June 2021, Evelin refused to participate in the visits, and they were ultimately suspended due to Evelin's failure to attend.

A psychological evaluation of Evelin was completed in May 2020 by Dr. Alexandra Munet. Diagnoses included an unspecified neurocognitive disorder, brief psychotic disorder-in remission, and adjustment disorder with mixed anxiety and depressed mood. Munet, who is bilingual,

provided individual therapy which enabled Evelin to learn how to cope with stressors and maintain stability. According to Munet, Evelin made great improvements during their time together. However, in April 2021, sessions were suspended while Munet was on maternity leave. Using the techniques they worked on in their sessions, Munet believed Evelin could cope on her own while she was on leave. However, she provided Evelin with information that allowed Evelin to make an appointment with another therapist with an interpreter if needed. Evelin did not return to individual therapy when her therapist returned from maternity leave. In fact, she did not return to individual therapy until February 2022. At that time, she was diagnosed with schizophrenia and was prescribed medication in addition to therapy.

Around the same time, it was discovered that Evelin was struggling in other areas of her life. In March 2021, Evelin received an eviction notice for failure to pay rent and had her power shut off due to failure to pay her bills. DHHS began to have concerns regarding Evelin's well-being. By June 2021, once visitations with the children had been suspended, Evelin was not utilizing any of DHHS' resources.

Jesus and Jose were placed with the same foster family throughout most of the duration of the case. However, when it became apparent that reunification with Evelin may not be possible, DHHS began searching for a placement which could be permanent. It was discovered that Evelin's oldest daughter, Mayra, and her husband lived in the area. DHHS contacted Mayra regarding the care of Jesus and Jose as a potential foster placement. After visitations with Evelin were suspended, Burns initiated child-parent psychotherapy with Mayra, her husband, Rodolfo, and the children. The children were then placed with Mayra and her family in August 2021. Since this placement and therapy, Jose has been exceeding developmental goals. He has been able to walk on his own, eat food on his own, and use sign language to communicate with his family. Similarly, Burns testified that Jesus has shown improved behaviors and was "tremendously intelligent." Burns testified that the most significant increases for the children occurred when working with Mayra and Rodolfo. Burns testified that during the pendency of the case, Jesus had struggled with caregiver confusion—not understanding who his primary caregiver is—but since being placed with Mayra this confusion has greatly subsided as he has bonded with Mayra and the other children in the home. Burns opined that visitation with Evelin should not resume if termination of her parental rights was being sought.

Following her eviction, Evelin was homeless for a period of time before moving into a homeless shelter. In October 2021, Evelin was assigned a new family support worker, Lisa Maria Guevara. With the assistance of Guevara, Evelin re-engaged with services. Evelin received a more specific mental health diagnosis that required medication and began a medication management program. She reconnected with Munet in February 2022. Evelin also found an apartment and was provided 6 months of rent payments from a community center. She moved out of the homeless shelter and into the apartment in February 2022. Evelin also reported having found a job preparing food at a local grocery store. This employment was verbally confirmed by the employer to a DHHS case worker, but no documentation was provided. Vensky testified that the employer reported that Evelin was paid in cash. Guevara assisted Evelin in filling out forms, making phone calls, and transporting Evelin to appointments. Due to the progress made since October 2021, Evelin filed a motion to resume visitation on December 9. Hearings on the motion were held over the course of 4 days ending on February 16, 2022. Evelin, her DHHS caseworker, and Guevara were called to

testify. The DHHS caseworker testified that if Evelin's parental rights were going to be terminated, then resuming visitation would not be in the best interests of the children. The court took the motion under advisement and ultimately overruled the motion.

On April 20, 2022, the juvenile court issued a written order terminating Evelin's parental rights for Jesus and Jose. The juvenile court described Evelin's progress as being like a roller coaster with a lot of ups and downs. The court credited much of Evelin's most recent progress to the family support worker doing the "heavy lifting" and noted that at this juncture it was uncertain whether Evelin could maintain her progress without the support she has received. The court also noted that even considering the progress made, Evelin had a long way to go before the court could seriously consider returning the children to her care. Additionally, the court cited to the stability Jesus and Jose had found in their current placement with Mayra. The juvenile court found that the State had not proven by clear and convincing evidence that Evelin neglected and refused to provide the juveniles with proper parental care and protection. However, the juvenile court went on to find clear and convincing evidence that Jesus and Jose were determined to be juveniles as described in § 43-247(3)(a), and that reasonable efforts to preserve and reunify the family, as required under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), under the direction of the court, have failed to correct the conditions leading to the determination; and that said juveniles had been in an out-of-home placement for 15 or more of the most recent 22 months. Finally, the court concluded that termination of Evelin's parental rights was in the best interests of Jesus and Jose.

Evelin appeals.

## ASSIGNMENTS OF ERROR

Evelin assigns, restated, that the juvenile court erred in (1) finding that statutory grounds existed to warrant the termination of her parental rights, (2) finding that termination of her parental rights was in the children's best interests, and (3) overruling her motion for change in visitation.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

## ANALYSIS

Neb. Rev. Stat. § 43-292 (Reissue 2016) lists the grounds for terminating parental rights. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence that one of the statutory bases enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Mateo L. et al., supra*.

*Statutory Grounds for Termination.*

The State sought to terminate Evelin's parental rights under § 43-292(2), (6) and (7). The juvenile court found by clear and convincing evidence that grounds existed under § 43-292(6) and (7). Any one of the bases for termination codified in § 43-292 can serve as the basis for termination

when coupled with evidence that termination is in the best interests of the child. *In re Interest Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Section 43-292(7) provides for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." That period of time was set by the Legislature as a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. *In re Interest of Mateo L. et al., supra.* This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *Id.* In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra.*

Evelin acknowledges in her brief that Jesus and Jose have been placed out of the parental home for more than 15 of the most recent 22 months. In fact, the children were out of Evelin's home from November 2019, when they were initially removed and placed in foster care, through the juvenile court's termination order in April 2022, or approximately 29 months. This satisfies § 43-292(7).

The State proved by clear and convincing evidence that Jesus and Jose had been in out-of-home placement for 15 out of the most recent 22 months satisfying § 43-292(7). Because any one of the bases for termination of parental rights codified by § 43-292 can serve as the basis for the termination of parental rights, we need not consider any other statutory bases for termination. See *In re Interest Leyton C. & Landyn C., supra.*

*Best Interests of Children.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J., supra.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent, which is overcome when the State has proven that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). Parental unfitness has been defined as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being." *Id.* at 370, 945 N.W.2d at 151.

In situations where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Because § 43-292(7) does not require the State to adduce evidence of any specific fault on the part of a parent, evidence to prove the statutory grounds for termination under the other sections of § 43-292 will be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Aaron D., supra.* Thus, it is in the context of analyzing the best interests of the juvenile that courts must respect a parent's commanding interest in the accuracy and justice of the decision to terminate parental rights. *Id.*

The best interests of the child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time. See *In re Interest*

*Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.* That is because permanency is in a juvenile's best interests because children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

Evelin argues that termination of her parental rights is not in the children's best interests because she has made progress toward achieving reunification with her children, but such progress has been impeded by poor case management by DHHS. According to Evelin, progress was hindered by the delayed start of child-parent psychotherapy and relegation of visitation to virtual only due to the COVID-19 pandemic. Evelin also asserts that there were communication difficulties due to some services not being offered in Spanish. In spite of her struggles with DHHS, Evelin points to the amount of progress she has made since October 2021. Contrary to Evelin's assertions on appeal, the State argues that it was Evelin whose participation in services was inconsistent. The State attributes Evelin's most recent progress to the efforts of Evelin's family support worker. Finally, the State argues that termination is in the children's best interests because of the great progress Jesus and Jose have made in their current placement with their older sister, Mayra. Upon our de novo review of the record, we find that termination of Evelin's parental rights is in the best interests of the children.

First, we do not agree that Evelin has been hindered by the inaction of DHHS. There were delays in the delivery of services, primarily due to the pandemic, but those delays were rectified by the court's granting of an exception (requested by DHHS) in February 2021. That exception provided Evelin additional time to engage in services. DHHS assisted Evelin with participating in many services, including, an initial diagnostic interview, parenting and psychological assessments, individual therapy, child-parent psychotherapy, medication management, team meetings, visitation, and family support. Further, DHHS made diligent efforts to communicate with Evelin in Spanish. Many of Evelin's family support workers, caseworkers, and therapists were bilingual. Interpreters were utilized when needed.

The primary areas where delays occurred involved child-parent psychotherapy and in-person visitation. These services were initially delayed due to health concerns for Jose amid the COVID-19 pandemic. Jose's immune system was compromised, therefore, medical professionals treating him recommended that he not be exposed to people in the community because of the high risk of catching and being seriously afflicted with COVID-19. In response, DHHS provided virtual visitations for Evelin and the children. When it was deemed to be safe for Jose, the visits were transitioned to in person. Burns testified at the termination hearing that child-parent psychotherapy needed to occur in person and ideally would occur within 6 months of the initial trauma experienced by the family. However, she also testified that the delay would not prevent the success of the therapy. Once it was safe for Jose to participate, child-parent psychotherapy with Burns was implemented. Based upon our review of the record, we do not agree with Evelin's assertion that DHHS impeded her ability to make progress toward reunification in any way. Rather, we find that Evelin's inconsistent efforts were at the root of her failure to progress.

The court ordered rehabilitation plan for Evelin required her to (1) participate in medication management services; (2) cooperate with a parenting and psychological assessment, as recommended by the initial diagnostic interview; (3) maintain a safe and stable home; (4) maintain

a legal means of income; (5) cooperate with family support services; and (6) participate in supervised visitation. The juvenile court described Evelin's participation and progress with the case as a "roller coaster with lots of ups and downs." We find this to be an accurate metaphor. Early on, Evelin struggled, but with the help of individual and child-parent psychotherapy sessions she was able to make some progress in early 2021. As a result, her visitation progressed from supervised to monitored. Unfortunately, Evelin was unable to maintain her progress. In May, her mental health and parenting ability had seriously deteriorated. Jesus was described as being "terrified" when contacted by Burns at Evelin's home. By June 2021, she was not engaging with the plan at all. Her mental health decompensated, she refused visitation, and she lost her housing. In the last few months prior to the termination hearing, Evelin, with significant assistance of her family support worker, re-engaged with the rehabilitative plan. While this did lead to a stabilization of housing, employment, and her mental health, as of the time of the hearing, Evelin still had not demonstrated that she could provide long-term stability for the children without significant intervention and assistance from various community resources. Moreover, she had not demonstrated the ability to access those resources of her own accord.

Evelin asks that we focus on the last few months immediately preceding the completion of the termination hearing. However, we must consider the entirety of her progress and behavior over the more than 2-year period preceding the court's order. While that history may show that she was climbing a hill during those final months, her overall history shows many ups and downs. She engaged, then retreated from mental health treatment before re-engaging. She was compliant and cooperative at times with therapy and family support, but also had episodes wherein she was belligerent and threatening toward caseworkers, therapists, and her children. Some of these incidents required calls to the police. She struggled to maintain income and housing. As was testified to by Burns, Evelin had good days and bad days. In the larger scope, Evelin had good periods spanning several months and bad periods where she totally disconnected for similar periods.

The court must also consider Evelin's ability to parent a special-needs child. According to Vensky, Evelin consistently questioned whether Jose actually had special needs. This is particularly concerning given that her lack of providing appropriate care for those very needs resulted in the initial order to remove the children from her home. We note that, with a sense of permanency and stability, both children have shown dramatic and even unexpected progress. According to Burns, reintroducing Evelin into the children's lives would cause confusion and attachment difficulties to the children unless it is clear that Evelin can provide them a long-term safe and stable home and that she can maintain her mental health. We note that Burns testified that Evelin had sought to disrupt the ongoing child-parent psychotherapy between Mayra and the children to the extent that police had to be called.

Jesus and Jose need stability and permanency. Even with her most recent progress, Evelin has not gained the ability to provide that permanency for them. Like the juvenile court, we are concerned whether once the significant support Evelin has received comes to an end, she will be able to maintain a safe and stable home. Moreover, Evelin has not demonstrated that she can successfully parent her children for any extended period of time. Jesus and Jose should not be made to await uncertain parental maturity. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Termination of Evelin's parental rights is in the children's best interests.

*Motion for Change of Visitation.*

As a final assignment of error, Evelin claims the court erred in overruling her motion to change visitation. Since June 2021, visitations between Evelin and the boys have been suspended. In December 2021, Evelin moved to reinstate visitation, which was overruled in light of the pending motion to terminate Evelin's parental rights. Because we have found that the court did not err in terminating Evelin's parental rights, we need not consider this assignment of error.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Evelin's parental rights to Jose and Jesus.

AFFIRMED.